[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
The plaintiff wife commenced this action for a dissolution of marriage on the ground of its irretrievable breakdown, by complaint returnable December 15, 1992. She also seeks custody of the parties' minor child, child support, alimony, an assignment of property and other relief, as on file. The defendant husband appeared by counsel,[1] no answer or cross complaint was filed, and the case was claimed for the uncontested trial list. Both parties were represented by counsel at the trial and submitted financial affidavits, proposed orders and written claims for relief. Each party testified and a number of documentary materials, including appraisal reports and income tax returns, were introduced into evidence. The taking of evidence was completed on April 22, 1994, and the court granted the parties until May 4, 1994 to CT Page 4951 file additional information in the form of a stipulation on: the issues of the allocation of the income taxes and the survivorship benefit and the premium thereon relating to the husband's military retirement income. Post-trial briefs were also filed together with the stipulation. The court and the parties therefore deemed the trial to be completed as of May 4, 1994.
From the evidence, the court finds as follows: The plaintiff married the defendant husband at Charlestown, South Carolina, December 31, 1971. Her birth name was Arcilia Martinez. The wife has been a resident of this state for at least one year before the entry of the decree in this case. All statutory stays have expired, and the court has jurisdiction.
The parties have one minor child issue of their marriage, Jacqueline Griffin, born May 24, 1984. No other minor children were born to the wife since the date of the parties' marriage, except Tanya, who died in 1981. The parties' third and oldest child, Luz, was born to the wife as a result of a prior relationship, and was adopted by the husband in 1974. Luz has now reached her majority and lives with the plaintiff and Jacqueline in the jointly owned family home in North Stonington, Connecticut.
Neither party or their minor child is a recipient of public assistance.
The husband is 48 years of age, and a high school graduate. He also has bachelor's and master's degrees in electrical engineering, and completed classroom course work for a doctorate, but was unable to finish the other requirements, and it is unlikely that he will do so. He is in good health, and has retired from a military career which includes almost three years of U.S. Army service as an officer. He left the Army and worked as an engineer in a shipyard for about one and one-half years. He then enlisted in the U.S. Coast Guard in 1973, went through Officer Candidate School (OCS), and retired with the rank of a commander in August, 1993, with a total of about 24 years of combined military service. He now lives and works in Panama City, Panama, as a consultant engineer for an American company, and earns $1,003 per week gross, with no federal or state income taxes deducted, due to his resident status. In addition, he receives $631 per week gross from his CT Page 4952 military pension; because he elected a survivor benefit option, $43 per week is deducted. After deduction for federal and state income taxes from his pension and medicare premiums and social security from his salary, he has a total net weekly income from both sources of $1,400 per week. This figure does not reflect the net weekly shortfall resulting from the rental of the former family home at 3721 Delbrook Road, Dumfries, Virginia.
The wife is 44 years old and was born in Columbia, South America. She finished the 11th grade in Columbia, left school, worked in a factory, and met the defendant while on vacation in Panama, where he was stationed. She ultimately obtained her high school diploma by GED in Puerto Rico, and has obtained cosmetology/hairdressing licenses in Connecticut and other states. She earned a certificate in cosmetology from Carteret Technical School. She states her GED was completed in Spanish, and although she speaks English fluently and appears to understand it well, she claims to be unable to read in it. She became a naturalized U.S. citizen in 1988. She presently works as a hairdresser at the sub base, three eight-hour days one week, and four the next, on an alternating basis. She earns $244 per week gross, and her financial affidavit reports deductions of $19 for income tax, $18 for social security and $1 for state income tax, leaving her $206 per week net. She denies receiving tips.
She testified that she has a number of health problems, which include a loss of hearing, whose onset was about 1989, and for which she has done little. She also claims to suffer from dizziness and bladder problems. She takes medication for a thyroid condition and for allergies. No medical or expert testimony was proffered to show that any of her health conditions, either alone or in combination with the others, affect her ability to work or impair her job performance. She does not appear to have acted diligently in obtaining treatment for her health problems, specifically her claim of hearing loss, and the court believes their effects are somewhat exaggerated.
The parties have agreed that sole legal physical custody of their daughter, Jacqueline, should be awarded to the mother, subject to reasonable rights of visitation with the father, to include thirty days per year in Panama. CT Page 4953
Each party testified about the behavior of the other at some length. The wife claimed that the husband had a number of sexual liaisons during the marriage, and that she had personally witnessed the defendant with other women in her home, on a nearby beach and on a cruise. She also testified that the defendant struck Tanya, shortly before her untimely death. Tanya suffered from Downs' Syndrome and a congenital heart condition. The wife also accused the defendant of tampering with the brakes on her car, in two attempts to kill her. Neither attempt was reported to the authorities, and the husband's explanation is not sinister and more credible. The court finds much of the wife's testimony on the fault issue improbable.
The husband claimed that the wife was a poor housekeeper, let the laundry and cleaning pile up, gadded about a lot and was essentially uninterested in being a homemaker, wife and mother. To his credit, when asked directly about who was at fault for the breakdown of the parties' marriage, he candidly would not or could not assess or attribute fault to his spouse. There was an alarming incident when the wife locked herself in a closet, and the husband injured himself trying to break in. There was a loaded gun in the closet. Each party's narrative of the underlying cause of this event was diametrically opposed. Fortunately, nothing irreversible happened, and the court is unable to determine whose version of this incident is more credible.
It is true that when the parties were living in Hawaii, and the husband was ordered to report to Panama, he tried to discourage the wife from joining him there, probably because of an incipient relationship with another woman. However, by that time the marriage had already broken down irretrievably. The parties were not communicating. They were arguing. The wife often left the home without explanation, and returned without explanation. She refused to accompany her husband when asked, and gave no reasons for her delays in ultimately doing so. She did not live up to his expectations of a military wife, especially that of a wife of an officer seconded to an embassy, as the defendant here.
Although the husband spoke, wrote, read and translated the Spanish language fluently, the court believes there was substantial culture shock and inability for this couple to really come together as a couple, and their marriage CT Page 4954 was troubled almost from the beginning. They had non accommodating personalities; there was always argument and tumult, they never reached common ground, and they clashed often. The wife removed their life savings of over $23,000 from a joint bank account in Hawaii, and with the exception of about $3,000 she returned to the defendant, claims to have spent the balance on gifts for members of her family, a funeral for a family member, and her living expenses.
On the state of this evidence, the court finds that the marriage has indeed broken down irretrievably, and further finds that the parties must each shoulder equal responsibility for that breakdown.
The parties had very little in terms of material assets when they married. The wife did work outside of the home for about one-third of the length of the parties' marriage. Her income was also contributed to family funds and used for family needs. The parties' first jointly-owned home was purchased with a down payment from joint savings and a mortgage, and when sold, its proceeds went into the Virginia home, which is now rented. Later, the Connecticut home in North Stonington was purchased, also with savings and a mortgage. The parties rented this too, while they moved among military housing.
The court finds that the husband's monetary contributions to the acquisition, preservation or appreciation in value of the assets of the parties are greater than that of the wife, and although her housekeeping and homemaking was far from sterling, the court concludes that as the husband had sea duty, intensively studied for his master's and doctorate degrees for long periods of time and had significant command and embassy responsibilities, that her non-monetary contributions to the marriage were greater than his.
The husband obviously has greater employability, vocational skills, earnings and earning capacity than the wife, and thus has a greater opportunity than she has to acquire capital assets and income in the future. Although Jacqueline is of school age, the wife, at least for a few more years will require some day care assistance if she maintains her present job schedule, and if she increases her workload to full time, will require more of such assistance. CT Page 4955
The court finds that the assets of the parties and the values thereof, consist of the following:
Jointly-owned single-family home in North Stonington, Connecticut, $130,000, less mortgage of $46,000, with an equity of: $84,000;
Jointly-owned single-family home in Dumfries, Virginia, $128,000, less mortgage of $50,000, with an equity of: 78,000;
Wife's IRA account: 7,812;
Husband's bank accounts: 1,500;
Husband's IRA accounts: 19,419;
 Husband's Metropolitan Life Insurance Co. Policy cash value: 9,400;[2]
Husband's U.S. Savings Bonds, face value: 6,150;
Total, with the bonds at face value: $206,281
In addition, they each have a motor vehicle, of modest value; the husband's, an equity of $3,000; the wife's, loan free, of $500. What is troubling to the court is the wife's total failure to report any value for the household furnishings in the Stonington home, which is fully furnished, and includes an IBM computer purchased in 1989 for $4,000 and between 15 and 20 Lladro porcelain figurines purchased for $150 to $200 each. She has not reported a value for her jewelry, which was purchased for several thousand dollars, nor her Lladros, which she claims were all `cracked', although the figurines are displayed in a china closet. The husband values all of the household items at $25,000.
She also reports deductions from her weekly gross income for federal income tax on her sworn financial affidavit, although her 1993 federal income tax return shows that she was assessed no income taxes for that year, and in fact was entitled to a refund in the amount of $2,185, including an earned income credit. See Defendant's Exhibit 7. Although the taxes are in fact withheld, the deductions do not accurately reflect the true picture. The refund was not shown on her CT Page 4956 financial affidavit, nor was any explanation offered as to the disposition of the refund if it had been already received. The court is not convinced of her explanation regarding the use of the $23,545 she withdrew from the parties' joint savings in 1990, as in the spring of 1991 she still had over $16,689 in a Panamanian bank, and most of her expenses were paid by the government while she was in Panama, including rent, utilities and maid service; moreover, the parties lived together for a good part of that time. Also, beginning some time after the parties' final separation in early 1992, the husband made the mortgage, taxes and home owner's insurance payments on the Stonington home and sent her $1,000 per month, to the time of trial. She simply provided no documentation, cancelled checks or other records relating to the depletion of this substantial sum.
At the conclusion of the court hearing, the court ordered that he make the May 1, 1994 Stonington mortgage payment and give the wife $1,000 by May 1, 1994, while the court awaited the parties' briefs and took the case under advisement.
The court has considered all of the criteria in General Statutes §§ 46b-62, 46b-81, 46b-82 and 46b-84,
in the light of the evidence and its findings, and orders:
(1) A decree dissolving the marriage shall enter on the ground of irretrievable breakdown.
(2) Sole custody of the minor child is granted to the mother; reasonable rights of visitation to the father which shall be at least thirty days per year, in Panama, or in such other place where he may reside. He is to provide round-trip transportation for the child.
(3) The defendant father shall pay the sum of $250[3]
per week as child support, which is within the child support guidelines. Said support shall be secured by immediate wage garnishment. If his employer has no office in this state, then defendant shall execute a wage deduction authorization. Commencing with the calendar year 1994 and so long as the defendant's employment income remains not subject to federal income taxation, the plaintiff shall have the dependency exemption for their minor child. In the event the defendant CT Page 4957 has income from employment in any year in which more than $25,000 of such income is subject to federal income taxation, he shall have the exemption, provided that he is current on his child support at the end of such year.
(4) He shall also provide and maintain his military health insurance (CHAMPUS) for the benefit of the minor child, and the parties shall equally share any unreimbursed or uncovered health or medical expenses. A General Statutes § 46b-84(c) order shall enter.
(5) As they become available, the plaintiff shall send copies of the child's report cards and medical reports to the defendant.
(6) The defendant shall transfer, by quit claim deed, all his right, title and interest in and to the North Stonington, Connecticut house to the plaintiff, subject to the mortgage thereon, which she shall pay and save him harmless therefrom.
(7) The plaintiff shall transfer, by quit claim deed, all her right, title and interest, in and to the Dumfries, Virginia house to the defendant, subject to the mortgage thereon, which he shall pay and save her harmless therefrom.
(8) The plaintiff shall take, have and own, free of defendant's claims, the following personal property: all of the contents and furnishings of the North Stonington house; her IRA account of $7,812; her bank account of $150; her 1986 motor vehicle; one half of the U.S. savings bonds[4]; and the sum of $9,709.50 transferred from the husband's IRA accounts, by Qualified Domestic Relations Order (QDRO).
(9) The defendant shall take, have and own, free of the plaintiff's claims, the following personal property: his 1993 motor vehicle; his bank accounts; one-half of the U.S. savings bonds; his Metropolitan Life Insurance Company policy cash value of $9,400 (subject to the order set forth hereinafter); the contents in the Virginia house and his personal effects; and the remainder of his IRA accounts.
(10) The husband shall maintain his Metropolitan Life Insurance Company policy in good standing, without CT Page 4958 impairment, with the wife as irrevocable beneficiary thereof, so long as he is obligated to pay alimony under this decree. The husband shall also provide an additional $100,000 insurance on his life with the minor child as irrevocable beneficiary, until she reaches the age of 18, at his expense. Although there was no evidence of his insurability, the availability to him of such a policy, or the cost of the premiums therefore, see [Michel v. Michel], 31 Conn. App. 338 (1993); the husband proposed such policy in his claims for relief. He shall execute and deliver an authorization for each policy to the wife so she may be able, from time to time, obtain information about the status and good standing of said policies directly from the carriers.
(11) The husband shall transfer by QDRO or other appropriate instrument fifty (50%) percent of his military pension benefit remaining after the deduction of the survivor benefit premium (now in the amount of $43 per week). Each spouse shall be liable for federal and/or state income taxes attributable to their respective portions of the retirement benefit, and each spouse (if the retirement plan permits) shall be the survivor beneficiary of the other's benefit.
(12) The defendant shall pay to the plaintiff, as periodic alimony, deductible by him, and taxable to her, the sum of $75 per week for a period of nine years from the date hereof, by which time their minor child will be emancipated and have graduated from high school. This sum will also assist the wife, over a reasonable time, if she desires to change careers, to obtain vocational training for other suitable employment, as she has contemplated. In any event, with her own home, her share of the military pension benefit and her employment income, she should, in all probability, be self-sufficient. Said alimony shall terminate upon her remarriage or pursuant to the provisions of General Statutes § 46b-86(b), or the death of either party.
(13) The defendant shall cooperate in assuring that the plaintiff shall remain covered under his military health insurance, at her expense, if any.
(14) Each party shall pay the liabilities shown on Schedule 3 of their respective financial affidavits and save the other harmless. CT Page 4959
(15) The defendant shall pay toward the plaintiff's counsel fees, the sum of $2,250 within sixty (60) days hereof, as the court finds that a total denial of an attorney's fee award to the plaintiff would undermine the other financial orders herein.
(16) All instruments of title necessary or incidental to the effectuation of these orders shall be executed and delivered within thirty (30) days hereof.
(17) The court shall retain jurisdiction over the retirement and IRA account transfers to ensure that its orders comply with applicable law.
Teller, J.